**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| CATALYST STRATEGIC ADVISORS, LLC, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | Civil Action No. 4:21-cv-02905 |
| CONTRACTORS BUILDING SUPPLY CO., LLC (D/B/A CBS RENTAL AND SUPPLY), | § § § § | |
| *Defendant*. | § § | |

## **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**[*]

**HAYNES AND BOONE, LLP**

/s/ *Michael J. Mazzone*
Michael J. Mazzone
Fed ID No. 4267
State Bar No. 13313000
1221 McKinney, Suite 4000
Houston, Texas 77010
Telephone: (713) 547-2115
Facsimile: (713) 236-5662
Michael.Mazzone@haynesboone.com

**ATTORNEY IN CHARGE FOR PLAINTIFF,
CATALYST STRATEGIC ADVISORS, LLC**

---

[*] Catalyst files this motion under seal because it refers to and includes documents produced by Defendant which were designated as "Highly Confidential – Attorneys' Eyes Only" per the Court's Agreed Protective Order of January 25, 2022.

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. ii

TABLE OF AUTHORITIES ........................................................................................... iii

I.    SUMMARY OF THE ARGUMENT ..................................................................... 1

II.   NATURE AND STAGE OF THE PROCEEDINGS ............................................. 2

III.  STATEMENT OF ISSUE TO BE DECIDED ...................................................... 2

IV.   SUMMARY JUDGMENT EVIDENCE ............................................................... 2

V.    UNDISPUTED FACTS ......................................................................................... 3

     A.    Catalyst is a consulting firm that specializes in the rental equipment business. ......... 3

     B.    CBS and Catalyst negotiate on and agree to a 2017 Engagement Letter. ................... 3

     C.    CBS and Catalyst operate under the 2017 Engagement Letter and then enter the 2018 and 2019 Engagement Letters. ...................................................................... 6

     D.    CBS terminates the 2019 Engagement Letter. ........................................................... 8

     E.    CBS completes a deal with Herc in 2021, within the term of the 2019 Engagement Letter ..................................................................................................... 9

VI.   SUMMARY JUDGMENT STANDARD .............................................................. 10

VII.  ARGUMENT & AUTHORITIES .......................................................................... 10

     A.    The parties made a valid and enforceable contract. .................................................... 11

     B.    Catalyst performed its obligations under the 2019 Engagement Letter. .................... 12

          1.    Catalyst performed advisory services under the 2019 Engagement Letter .................................................................................................. 12

          2.    CBS agrees that Catalyst performed ................................................... 13

          3.    The parties agreed that Catalyst was not required to be the "but-for" or "procuring cause" of any transaction. ............................................. 14

     C.    CBS breached the 2019 Engagement Letter and Catalyst suffered damages............ 16

VIII.    CONCLUSION & PRAYER .............................................................................. 17

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Vinson Expl., Inc.*, 832 S.W.2d 657 (Tex. App.—El Paso 1992, writ denied)..........12

*BP America Production Co. v. Zaffrini*, 419 S.W.3d 485 (Tex. App.—San Antonio 2013, pet. denied)...................................................................................................................................15

*Bushidopro, C.A. v. Nippon Pillar Corp. of Am., Inc.*, No. 4:19-CV-4249, 2021 WL 3660766 (S.D. Tex. Mar. 22, 2021) ...............................................................................................15

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................10

*Del Monte Corp. v. Martin*, 574 S.W.2d 597 (Tex. App.—San Antonio 1978, writ denied) .......12

*E.W. Bank v. 4G Metals, Inc.*, No. CV H-16-1917, 2016 WL 6895077, at *2 (S.D. Tex. Nov. 23, 2016) ........................................................................................................................10, 11

*Houston Exploration Co. v. Wellington Underwriting Agencies*, 352 S.W.3d 462 (Tex. 2011)...15

*Keener v. Cleveland*, 250 S.W. 151 (Tex. Comm'n App. 1923)....................................................14

*Martinez v. Bally's Louisiana, Inc.*, 244 F.3d 474 (5th Cir. 2001)................................................11

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907 S.W.2d 517 (Tex. 1995) ...10

*Perthuis v. Baylor Miraca Genetics Lab'ys, LLC*, — S.W.3d —, 2022 WL 1592587 (Tex. May 20, 2022) ........................................................................................................................14, 15

*PNP Petroleum I, LP v. Taylor*, 438 S.W.3d 723 (Tex. App.—San Antonio 2014, pet. denied) .15

*Shanklin v. Columbia Mgmt. Advisors, L.L.C.*, CIV.A. H-07-2690, 2008 WL 4899631 (S.D. Tex 2008) ........................................................................................................................15

*Smith Intern., Inc. v. Egle Group, LLC*, 490 F.3d 380 (5th Cir. 2007)....................................10, 16

*Weitzul Constr., Inc. v. Outdoor Environs*, 849 S.W.2d 359 (Tex. App.—Dallas 1993, writ denied) ........................................................................................................................12

*York Group, Inc. v. Horizon Casket Group, Inc.*, 459 F. Supp. 2d 567 (S.D. Tex. 2006).......10, 11

**Other Authorities**

Fᴇᴅ. R. Cɪᴠ. P. 56 ........................................................................................................................10

### PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff, Catalyst Strategic Advisors, LLC ("Catalyst"), files this motion against Defendant, Three Diamond Capital SBC, LLC f/k/a Contractors Building Supply Co., LLC (d/b/a CBS Rental and Supply) ("CBS").

### I.    SUMMARY OF THE ARGUMENT

This is a breach of contract case. Catalyst agreed to provide advisory and consulting services to CBS, and CBS promised to pay fees to Catalyst, including a "completion fee" if CBS was sold. But when CBS was sold, it refused to pay.  CBS refused to pay even though it admitted that Catalyst did "a great job in representing the interests of CBS" and that CBS was "obligated to pay Catalyst Strategic Advisors."

CBS cannot escape its obligation to pay by demanding proof that Catalyst was the "but-for" or "procuring cause" of the sale of CBS or that its services be tied directly to this sale. Catalyst may well have been the "but-for" and "procuring cause" of the sale, as a direct result of its services— but under the plain terms of the parties' agreement, Catalyst's right to payment does not depend on such proof. Indeed, CBS sought to include this requirement when negotiating its agreement, but Catalyst expressly rejected the proposed requirement – and CBS accepted this rejection when it entered into the agreement without any "but-for" or "procuring cause" language.

By refusing to pay Catalyst the completion fee, CBS has breached the parties' agreement and Catalyst has been damaged in the amount of the unpaid fee, interest, and attorney's fees. The amount of the unpaid fee is set by a contractual formula and can be calculated by the parties. As a practical matter, therefore, a determination of breach on summary judgment should bring this dispute to an end.

## II.    NATURE AND STAGE OF THE PROCEEDINGS

Catalyst filed this lawsuit on September 3, 2021. The discovery deadline is June 10, 2022. The case is set for trial on December 5, 2022.

## III.    STATEMENT OF ISSUE TO BE DECIDED

In exchange for services, CBS agreed that Catalyst would be paid a completion fee upon the closing of a transaction of a certain value and involving the sale of the assets of CBS. Such a transaction closed within the term of the parties' agreement. Is CBS liable to Catalyst for the completion fee?

## IV.    SUMMARY JUDGMENT EVIDENCE

Plaintiff relies on the following summary judgment evidence contained in an appendix filed with this motion (citations to which are "App. at [page number]"):

| Document | Appendix Page |
|---|---|
| 1.  Declaration of June 10, 2022 of Joseph Kondrup, Jr. | App. at 1–10 |
| 2.  Excerpts of Catalyst's website showing Catalyst's experience and completed transactions | App. at 11–29 |
| 3.  Email of November 27, 2017 sent by Joseph Kondrup, Jr. and Dan Van Der Aue of Catalyst to Charles Jason Herin and Matt Odom of CBS attaching comments to CBS's proposed 2017 Engagement Letter | App. at 30–47 |
| 4.  November 28, 2017 Engagement Letter | App. at 48–56 |
| 5.  June 1, 2018 Engagement Letter | App. at 57–64 |
| 6.  June 6, 2019 Engagement Letter | App. at 65–73 |
| 7.  Documents evidencing Advisory Services | App. at 74–222 |
| 8.  Termination Letter of April 30, 2020 from Charles Jason Herin of CBS to Joseph Kondrup, Jr. of Catalyst | App. at 223–224 |

| 9.  Herc Press Release of August 30, 2021 announcing Herc's completion of the acquisition of CBS | App. at 225–227 |
|---|---|
| 10. Excerpts of Herc Holdings Inc. Form 10-Q (period ending March 31, 2022) | App. at 228–229 |
| 11. Excerpts of the Asset Purchase Agreement of July 28, 2021 between Herc and CBS | App. at 230–231 |
| 12. Excerpts of the Disclosure Schedules to the Asset Purchase Agreement of July 28, 2021 between Herc and CBS | App. at 232–235 |
| 13. First Amendment to Asset Purchase Agreement of August 30, 2021 between Herc and CBS | App. at 236–239 |
| 14. CBS's Responses to Catalyst's Requests for Admission (served February 21, 2022) | App. at 240–245 |

## V.   UNDISPUTED FACTS

### A.   Catalyst is a consulting firm that specializes in the rental equipment business.

Catalyst is an experienced boutique consulting firm that provides advisory services to companies in the equipment rental industry – specializing in facilitating mergers and acquisitions as well as business sales and divestitures. [App. at 2, ¶¶ 2, 3]. Two of its founding members formerly served as executives at a nationwide rental equipment company. Catalyst's team has a wealth of knowledge and experience in the rental equipment business. [App. at 3, ¶ 3].

Catalyst's expertise has led it to develop contacts at all the major rental equipment companies. [App. at 2, ¶ 3; 13–26; 130]. Catalyst has enjoyed success performing consulting and advisory services for its clients, having served as an advisor on more than 300 transactions that total more than $12 billion in value. [App. at 13–26; 131].

### B.   CBS and Catalyst negotiate on and agree to a 2017 Engagement Letter.

When CBS first engaged Catalyst in 2017, the parties negotiated the terms that would govern their relationship. [App. at 3, ¶¶ 5, 6; 30–56]. The terms were memorialized in an

engagement letter that set forth the scope of services Catalyst would provide, with examples, and the compensation that CBS would pay Catalyst for its services. [App. at 4, ¶ 8; 48–56].

The parties negotiated by exchanging redline drafts. [App. at 4, ¶ 6; 30–47]. Of particular relevance here, the parties negotiated a component of Catalyst's compensation known as the "Advisory Completion Fee." CBS proposed to limit this fee to transactions in which the "buyer [was] cultivated by Catalyst." [App. at 4, ¶ 6; 30–47]. However, Catalyst explained that it was "unable to accept" this limitation:



[*Id.*]. As reflected in the comments of the mark-up, Catalyst expressly rejected CBS's proposal to require Catalyst to "cultivate" CBS's ultimate buyer, explaining that Catalyst would be investing "significant resources to help CBS optimize value and should be paid on any transaction regardless of where the ultimate buyer is sourced from." [*Id.*].

Catalyst also rejected similar proposed language contained in the provision outlining the length of the agreement. [App. at 35]. Here, too, Catalyst specifically rejected CBS's proposal that upon termination of the agreement Catalyst would only be paid the Advisory Completion Fee if the sale of CBS was completed within one year of the agreement's termination and involved "a

buyer cultivated by Catalyst." [*Id.*]. In response to requests for admissions in this case, CBS admitted the mark-up shown here and in the Appendix is a true and correct copy. [App. at 243].

That engagement letter was executed on November 28, 2017 ("2017 Engagement Letter"). [App. at 48–56]. The "but-for/procuring cause" language—"a buyer cultivated by Catalyst"—was not included in the signed version of the 2017 Engagement Letter and the "tail" period was agreed to be 18 months (rather than one year proposed by CBS or two years proposed by Catalyst). The 2017 Engagement Letter reflected CBS's agreement to compensate Catalyst for its advisory services by paying a $25,000 quarterly "Advisory Service Fee" which would be credited toward the "Advisory Completion Fee" payable upon the completion of a "Transaction" such as the sale of CBS. [App. at 50]:

---

**Fees & Expenses.**  As compensation for Catalyst performing the Advisory Services, Client agrees to compensate Catalyst as follows:

a)   "Advisory Service Fee" of $25,000 per quarter, commencing on the execution of this Engagement Letter.  Advisory Service Fees paid in the eighteen (18) months immediately prior to a Transaction will be credited towards the Advisory Completion Fee noted below.

b)   Upon the closing of a Transaction, Catalyst will earn an "Advisory Completion Fee" which shall be calculated as follows based upon the example provided on Exhibit B:

    I.   Base Fee of 2.0% of Total Enterprise Value (TEV) attributable to up to 6.0x the Adjusted EBITDA for the trailing 12 month period prior to the Transaction (the "Adjusted TTM EBITDA"), plus;

    II.   5.0% of incremental TEV greater than 6.0x Adjusted TTM EBITDA up to 6.5x Adjusted TTM EBITDA, plus;

    III.   10.0% of incremental TEV greater than 6.5x Adjusted TTM EBITDA

---

[*Id.*].

---

**Term.**  The term of this Engagement ("Term") shall commence on the date of mutual execution of this Engagement Letter ("Commencement Date") and shall continue thereafter until terminated by the Company or Catalyst upon thirty (30) days prior written notice.  Upon any termination of this Engagement by the Company, Client will be obligated to pay Catalyst the Advisory Fees according to the calculation formula noted above for any Transaction that is completed during the period from the date of this letter until eighteen (18) months after the date of termination of this agreement.

---

[App. at 51].

CBS and Catalyst operated under the 2017 Engagement Letter from November 28, 2017 through June 1, 2018. [App. at 4, ¶ 6]. During this time, Catalyst performed advisory services and introduced CBS to potential buyers, and CBS paid Catalyst the quarterly Advisory Service Fee. However, no transaction occurred.

**C.     CBS and Catalyst operate under the 2017 Engagement Letter and then enter the 2018 and 2019 Engagement Letters.**

In 2018, Catalyst and CBS entered a second engagement letter ("2018 Engagement Letter"). [App. at 4, ¶ 9; 57–64]. As before, Catalyst performed advisory services including buyer contacts and meetings and attempting to facilitate a transaction, but no transaction took place. CBS terminated the relationship on October 10, 2018, noting that the company had changed its mind about entertaining an enterprise-wide sale. [App. at 5, ¶ 10].

In 2019, CBS engaged Catalyst again. [App. at 5, ¶¶ 13, 14]. This time for a limited purpose. CBS was not seeking an enterprise-wide sale. [*Id.*]. Instead, CBS wanted Catalyst to help it divest a business unit in Tampa, Florida to one of Catalyst's clients. [App. at 5, ¶ 13]. Catalyst facilitated the divestment and CBS paid Catalyst a $300,000 fee. [App. at 5, ¶ 14].

On the heels of the Tampa transaction, CBS regained its appetite to pursue an enterprise-wide sale. Once again, CBS sought Catalyst's help. [*Id.*]. On June 6, 2019, the parties signed their third engagement letter (the "2019 Engagement Letter"). [App. at 65–73]. The 2019 Engagement Letter essentially mirrors the parties' past engagement letters:

○ **Purpose of the 2019 engagement:**

Client has requested that Catalyst perform certain consulting services related to a potential transaction involving a merger or the sale of all or substantially all the stock, membership interests or assets of the Company (a "Transaction"). The terms and conditions of the Engagement are set forth below and on the attached Exhibit A.

[App. at 66].

○ **Scope of services Catalyst would provide CBS:**



[App. at 66-67].

- **Catalyst's compensation structure in the 2019 Engagement Letter:**

> 2. **Fees & Expenses**. As compensation for Catalyst performing the Advisory Services, Client agrees to compensate Catalyst as follows:
>
> a) "Advisory Service Fee" of $25,000 per quarter, commencing on the execution of this Engagement Letter.
>
> b) For any Transaction with a Total Enterprise Value (as defined below) of $50 million or more, and involving a merger or the sale of all or substantially all the stock, membership interests or assets of the Company, upon the closing of such a Transaction, Catalyst will earn an "Advisory Completion Fee" which shall be calculated as follows:
>
>     I. Base Fee of 2.0% of Total Enterprise Value (TEV) attributable to up to 6.0x the Adjusted EBITDA for the trailing 12-month period prior to the Transaction (the "Adjusted TTM EBITDA"), plus;
>
>     II. 5.0% of incremental TEV greater than 6.0x Adjusted TTM EBITDA up to 6.5x Adjusted TIM EBITDA, plus;
>
>     III. 10.0% of incremental TEV greater than 6.5x Adjusted TTM EBITDA
>
>     IV. Any Advisory Service Fees paid in eighteen (18) months immediately prior to a Transaction involving the sale of all or substantially all the stock or assets of the Company will be credited towards the Advisory Completion Fee noted above.

[App. at 67].

- **The term and tail period:**

> **Term.** The term of this Engagement ("Term") shall commence on the date of mutual execution of this Engagement Letter ("Commencement Date") and shall continue thereafter for a period of twelve (12) months, unless terminated by the Company or Catalyst upon thirty (30) days prior written notice. The Term shall automatically renew for successive twelve (12) month periods unless terminated by the Company or by Catalyst no less than thirty (30) days prior to the end of the Term. Upon any termination of this Engagement by the Company, Client will be obligated to pay Catalyst the Advisory Completion Fee according to the calculation formula noted above for any Transaction that is completed during the period from the date of this letter until eighteen (18) months after the date of termination of this Engagement.

[App. at 68].

Like the earlier engagement letters, the 2019 Engagement Letter excluded the "but-for/procuring cause" language—"buyer cultivated by Catalyst"—that CBS had proposed, but agreed to forgo, in 2017. [App. at 67]. The "tail" period was 18 months. [App. at 68]. The 2019 Engagement Letter is the basis of Catalyst's breach of contract claim in this lawsuit.

**D.    CBS terminates the 2019 Engagement Letter.**

After operating under the 2019 Engagement Letter for approximately one year, CBS terminated its relationship with Catalyst on April 30, 2020, effective May 30, 2020, "in light of

the ongoing world events," presumably referring to the global pandemic. [App. at 8, ¶ 20; 223–224]. In terminating the 2019 Engagement Letter, CBS praised Catalyst's work, noting:

> You and your team have done a great job in representing the interests of CBS for the scope of services for this Engagement…[t]he termination of this Engagement is not a reflection of any dissatisfaction on our part but is a reflection of the markedly changed market conditions we are currently experiencing.

[App. at 224]. In its responses to requests for admissions in this case, CBS admitted that "Catalyst performed certain consulting services" under the 2019 Engagement Letter. [App. at 242].

## E.    CBS completes a deal with Herc in 2021, within the term of the 2019 Engagement Letter.

In early August 2021—within the 18 month "tail" period of the 2019 Engagement Letter—Catalyst learned that CBS was to be acquired by a third-party, Herc Rentals Inc. ("Herc"). [App. at 8, ¶¶ 22, 23; 225–227]. Catalyst had introduced CBS to Herc and performed substantial advisory services for CBS related to a potential deal between CBS and Herc. [App. at 6–7, ¶¶ 17, 18; 81–135; 136–161]. When it appeared that the sale of CBS to Herc was imminent and within the tail period outlined in the 2019 Engagement Letter, CBS contacted Catalyst. [App. at 9, ¶ 23]. CBS confirmed that it was "negotiating" a deal with Herc but insisted it did not owe Catalyst the Advisory Completion Fee. [*Id.*]. It also threatened to postpone the closing of its agreement with Herc until the conclusion of the 2019 Engagement Letter's 18-month tail period (i.e., to a date after November 30, 2021). [*Id.*].

Notwithstanding this threat, the sale of substantially all of CBS's assets was indeed closed on or before August 30, 2021. [App. at 225–239]. Because substantially all of CBS's assets were sold within the tail period of the 2019 Engagement Letter, Catalyst asked CBS to pay the Advisory Completion Fee, but CBS refused to pay, breaching the 2019 Engagement Letter. As a result of

CBS's failure to pay, Catalyst has sustained damages in the amount of the Advisory Completion Fee, interest, and attorney's fees.

## VI.    SUMMARY JUDGMENT STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Courts routinely determine, at summary judgment, wholly legal issues like the one presented here because they are capable of being resolved merely through the interpretation of contracts and Texas caselaw. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995).

The Court is tasked with deciding the liability portion of Catalyst's breach of contract claim because it is a purely legal question ripe for summary judgment. Catalyst's damages, calculated by a formula in the 2019 Engagement Letter, can be readily decided later.

## VII.    ARGUMENT & AUTHORITIES

The 2019 Engagement Letter is governed by Texas law. [App. at 72]. Under Texas law, the elements of a breach of contract claim are: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Smith Intern., Inc. v. Egle Group, LLC*, 490 F.3d 380, 387 (5th Cir. 2007).

The Federal Rules of Civil Procedure permit parties to seek summary judgment on all elements of a breach of contract claim, or to bifurcate the breach of contract question into questions of liability and damages. FED. R. CIV. P. 56(a); *E.W. Bank v. 4G Metals, Inc*., No. CV H-16-1917, 2016 WL 6895077, at *2 (S.D. Tex. Nov. 23, 2016); *see York Group, Inc. v. Horizon Casket*

*Group, Inc*., 459 F. Supp. 2d 567, 574 (S.D. Tex. 2006). Summary judgment on the breach of contract liability question is proper when liability can be proven without creating fact questions. *4G Metals*, 2016 WL 6895077, at *2. Answering the liability question requires the movant to demonstrate the existence of a valid contract, performance by the movant, breach by the non-movant, and that the breach damaged the movant as a matter of law. *York Group, Inc.*, 459 F. Supp. 2d at 574 (noting that the movant need not introduce any evidence as to the quantum of the damages when merely seeking a liability determination).

Catalyst moves for judgment on liability. Its damages, the amount of the Advisory Completion Fee, are based on a formula described in the 2019 Engagement Letter (a percentage of "Total Enterprise Value attributable" to a multiple times "Adjusted EBITDA for the trailing 12-month period prior to the Transaction"). [App. at 67]. If liability is resolved in Catalyst's favor, Catalyst anticipates that the parties will be able to agree on the amount of the Advisory Completion Fee and resolve this dispute without further involvement by the Court. In the event the parties fail to agree, Catalyst will submit a second motion for summary judgment on damages.

## A.       The parties made a valid and enforceable contract.

The first element of Catalyst's claim is undisputed. Catalyst and CBS agree that there was a valid, enforceable contract between the parties at the time of the CBS-Herc sale. CBS admits this in its live pleading, which constitutes as a judicial admission. *See* Docket No. 12, CBS Answer to Complaint, at 3, ¶ 11, 17, 23; *Martinez v. Bally's Louisiana, Inc*., 244 F.3d 474, 476 (5th Cir. 2001) (Noting that "a judicial admission … has the effect of withdrawing a fact from contention" and that judicial admissions are "conclusive" against the party who made the admission).

**B.      Catalyst performed its obligations under the 2019 Engagement Letter.**

The second element of Catalyst's claim is likewise satisfied because the summary judgment evidence establishes that Catalyst provided advisory services to CBS thereby performing under the 2019 Engagement Letter.

**1.      Catalyst performed advisory services under the 2019 Engagement Letter.**

Catalyst performed under the 2019 Engagement Letter. Under Texas law, a party to a contract satisfies its obligations thereunder if it can establish it fully or substantially performed its contractual obligations. *See Weitzul Constr., Inc. v. Outdoor Environs*, 849 S.W.2d 359, 363 (Tex. App.—Dallas 1993, writ denied). There is no distinction under Texas law between fully or substantially performing; substantial performance is "the legal equivalent to full performance." *Anderson v. Vinson Expl., Inc.*, 832 S.W.2d 657, 666 (Tex. App.—El Paso 1992, writ denied); *Del Monte Corp. v. Martin*, 574 S.W.2d 597, 599 (Tex. App.—San Antonio 1978, writ denied) ("Substantial compliance … is the legal equivalent of full compliance").

The 2019 Engagement Letter between Catalyst and CBS states that "Catalyst's services shall consist of providing advisory services to [CBS] in connection with a Transaction (the "Advisory Services") … The Advisory Services *may* include the following," and then lists 12 different services representative of the type of work Catalyst might perform. [App. at 66–67] (emphasis added). The term "Transaction" is defined as "a potential transaction involving a merger or the sale of all or substantially all the stock, membership interests or assets of [CBS]." [App. at 66, ¶ 1].

The advisory services defined under the parties' agreement and performed by Catalyst— shown in full above on page 7 of this motion and in the 2019 Engagement Letter [App. at 66– 67]—fall into several buckets. First, Catalyst helped CBS centralize, visualize, and report its financial and performance data. Catalyst developed marketable packages from CBS's financial

and performance data, shared it with CBS, and shared it with potential buyers, including Herc. Second, Catalyst developed industry reports and shared market insights with CBS. It also developed programs and held meetings with CBS executives to implement plans to make CBS more marketable for an enterprise-wide transaction. Third, Catalyst largely took care of the administrative tedium associated with an enterprise-wide sale. For example, Catalyst handled the procurement of non-disclosure agreements between CBS and potential buyers; helped vet and screen potential buyers; developed a virtual data room for potential buyers; introduced CBS to potential buyers; and coordinated document preparation and workflows. Finally, Catalyst communicated with potential buyers, including Herc, regarding an enterprise-wide sale of CBS. [App. at 176–178] ("Herc – discussed [acquisition of CBS] with CFO … He will gauge their appetite and advise in due course"). This included evaluating proposals and their terms, and helping CBS negotiate potential transactions. [*Id.*].

Catalyst performed these services and others. [App. at 6–7, ¶ 17]. Included in the Appendix is the declaration of Mr. Joseph Kondrup, Jr., the Founder and Managing Principal of Catalyst, which lists the services Catalyst provided after the execution of the 2019 Engagement Letter. [App. at 1 – *et. seq*]. Mr. Kondrup also identifies the documents that demonstrate Catalyst's performance of these services, [App. at 6–7, ¶ 18], and these documents are included in the Appendix [App. 74–222].

### 2.      CBS agrees that Catalyst performed.

The evidence of Catalyst's performance is uncontroverted. Indeed, CBS has admitted that Catalyst performed advisory services under the 2019 Engagement Letter. [App. at 242]. And CBS praised Catalyst for its performance:

"You and your team have done a great job in representing the interests of CBS for the scope of services for this Engagement. Thank you for your and your team's efforts in assisting CBS in a potential sale."

[App. at 8, ¶ 20; 223–224].

There is further proof of Catalyst's performance: CBS paid Catalyst the quarterly fees called for by the 2019 Engagement Letter. [App. at 9, ¶¶ 24, 25]. As discussed above, the primary form of compensation was the Advisory Completion Fee with the quarterly Advisory Service Fee to be credited toward the Advisory Completion Fee. [App. at 67, ¶ 2(b)(iv)].  CBS paid the quarterly component of the fee for Catalyst's advisory services because Catalyst provided these praised and paid-for services as promised. [App. at 9, ¶ 24-5].

Finally, in the very agreement in which CBS sold its assets to Herc in August of 2021, CBS admitted that it is "obligated to pay Catalyst Strategic Advisors a fee for any transaction completed prior to October 30, 2021." [App. at 235]. Of course, CBS was "obligated to pay Catalyst" because Catalyst had performed its obligations under the 2019 Engagement Letter. To admit one is to admit the other.

### 3.    The parties agreed that Catalyst was not required to be the "but-for" or "procuring cause" of any transaction.

CBS cannot escape its contractual obligation to pay the Advisory Completion Fee by demanding proof that Catalyst was the "but-for" or "procuring cause" of the sale of CBS to Herc or that its services were directly tied to this sale. Procuring cause is a concept in contracts (often in brokerage agreements) where a fee is earned by bringing about a transaction. *Perthuis v. Baylor Miraca Genetics Lab'ys, LLC*, —S.W.3d—, 2022 WL 1592587, at *1 (Tex. May 20, 2022); *Keener v. Cleveland*, 250 S.W. 151, 153 (Tex. Comm'n App. 1923). But Catalyst is not a mere broker; its role was not to market CBS to buyers. Rather, Catalyst provided advisory and consulting services to help CBS market itself and be acquired by a buyer.

Catalyst may well have been the "but-for" or "procuring cause" of Herc's purchase of CBS, but it does not need to prove that it was to recover the Advisory Completion Fee. The reason is simple: There is no such requirement in the 2019 Engagement Letter. Adding such a requirement would contravene not only settled contract law, but also the parties' intentions. The 2019 Engagement Letter carried forward the terms of the 2017 Engagement Letter, and the parties specifically rejected any such requirement when they negotiated their relationship in 2017. This is the significance of Catalyst's refusal to accept the proposed addition by CBS of the words "a buyer cultivated by Catalyst." Final versions of each engagement letter excluded that term. Why? Because the parties specifically excluded such a requirement in their agreements.[1]

Importantly, the "procuring cause" standard does not even apply here. *See Baylor Miraca*, 2022 WL 1592587 at *4–6.

> [T]he procuring-cause doctrine is merely a default rule … Departing from the procuring-cause doctrine's default rule requires no magic language. A contract merely needs to provide terms that are inconsistent with the default rule—which is to say, terms that in some way cabin the textually imposed contractual obligation to pay a commission.

*Id.* at *6.

The 2019 Engagement Letter did precisely this: in exchange for Catalyst providing advisory services, CBS would pay Catalyst an advisory completion fee "upon the closing" of a transaction within the term of the engagement. [App. at 67].

The "procuring cause" doctrine only "applies when a contract is silent or ambiguous as to when commissions are earned." *Bushidopro, C.A. v. Nippon Pillar Corp. of Am., Inc*., No. 4:19-

---

[1] Catalyst and the Court are permitted to rely on the redlined document reflecting the parties' negotiation of the 2017 Engagement Letter because such negotiations "inform, rather than vary from or contradict, the contract text." *BP America Production Co. v. Zaffirini*, 419 S.W.3d 485, 500 (Tex. App.—San Antonio 2013, pet. denied) (citing *Houston Exploration Co. v. Wellington Underwriting Agencies*, 352 S.W.3d 462, 69 (Tex. 2011)); *see PNP Petroleum I, LP v. Taylor*, 438 S.W.3d 723, 735 (Tex. App.—San Antonio 2014, pet. denied) (finding the trial court committed error for failing to consider contract text that had been struck through by one of the parties).

CV-4249, 2021 WL 3660766, at *4 (S.D. Tex. Mar. 22, 2021); *Shanklin v. Columbia Mgmt. Advisors, L.L.C.*, CIV.A. H-07-2690, 2008 WL 4899631, at *16 (S.D. Tex. 2008) (finding the procuring cause rule applies only if the agreement does not expressly provide when the person is entitled to commissions).

Here, the 2019 Engagement Letter is neither silent nor ambiguous as to the payment of advisory fees. It expressly requires CBS to pay quarterly fees and the Advisory Completion Fee "upon the closing" of a sale of CBS. Accordingly, Catalyst need not prove that it was the "but-for" cause or the "procuring cause" of the sale of CBS. It need not show that it "cultivated" any buyer. Catalyst provided advisory services; it performed under the 2019 Engagement Letter as a matter of law.

**C.    CBS breached the 2019 Engagement Letter and Catalyst suffered damages.**

CBS breached the 2019 Engagement Letter by failing to pay Catalyst its earned Advisory Completion Fee. CBS agreed to pay Catalyst the Advisory Completion Fee if: (1) Catalyst performed advisory services; (2) a transaction "involving a merger or the sale of all or substantially all the stock, membership interests or assets" of CBS occurred; and (3) such a transaction closed within the term of the 2019 Engagement Letter. All these conditions occurred. CBS is liable for breach of contract. *See Smith Intern., Inc.*, 490 F.3d at 387.

Catalyst performed advisory services under the 2019 Engagement Letter. A "Transaction," as defined in the 2019 Engagement Letter, occurred: Herc acquired all or substantially all the assets of CBS. Excerpts of the Asset Purchase Agreement executed between CBS and Herc are included in the Appendix. [App. at 230–231]. Here is the relevant part:

> ### ARTICLE I
> ### PURCHASE AND SALE
>
> **1.1    Agreement to Purchase and Sell.**  Subject to the terms and conditions set forth herein, Seller shall sell, assign, transfer, convey and deliver to Purchaser, and Purchaser shall purchase and acquire from Seller, all right, title and interest of Seller in and to (a) the Business as conducted by Seller, including its goodwill, and (b) except for the Excluded Assets, all of the assets, properties and rights of Seller of every kind and description, real, personal and mixed, tangible and intangible, wherever situated (which assets, properties and rights are collectively referred to herein as the "Assets"), free and clear of all Liens, other than Permitted Liens.

[*Id.*].

This transaction closed within the 18-month "tail" period of the 2019 Engagement Letter. The sale closed on August 30, 2021. [App. at 229; 236–239]. The 2019 Engagement Letter was terminated, effective on May 30, 2020. [App. at 224]. 18-months after May 30, 2020 is November 30, 2021. Therefore, the sale of CBS occurred within the term of the 2019 Engagement Letter. [App. at 229; 236–239].

CBS breached the 2019 Engagement Letter by failing to pay Catalyst, and as a result, Catalyst suffered damages in the amount of the unpaid Advisory Completion Fee, interest, and attorney's fees.

## VIII.   CONCLUSION & PRAYER

Catalyst respectfully requests that the Court grant Catalyst's Motion for Partial Summary Judgment, and rule: (1) that CBS breached the 2019 Engagement Letter by failing to pay Catalyst the Advisory Completion Fee called for by the 2019 Engagement Letter; (2) that CBS is liable to Catalyst for the Advisory Completion Fee, the amount of which will be determined at a later date; (3) that CBS is obligated to pay Catalyst its reasonable attorney's fees, costs of court, and pre- and post-judgment interest; and (4) that Catalyst have any other relief to which it is entitled to at equity or law.

Respectfully submitted,

**HAYNES AND BOONE, LLP**

/s/ *Michael J. Mazzone*
Michael J. Mazzone
Fed ID No. 4267
State Bar No. 13313000
1221 McKinney, Suite 4000
Houston, Texas 77010
Telephone: (713) 547-2115
Facsimile: (713) 236-5662
michael.mazzone@haynesboone.com

**ATTORNEY IN CHARGE FOR
PLAINTIFF, CATALYST STRATEGIC
ADVISORS, LLC**

**OF COUNSEL:**

**HAYNES AND BOONE, LLP**

Ryan Patrick
Fed ID No. 3006419
State Bar No. 24049274
Julia Peebles
State Bar No. 24096131
Fed ID No. 3350745
1221 McKinney, Suite 4000
Houston, Texas 77010
Telephone: (713) 547-2053
ryan.patrick@haynesboone.com
julia.peebles@haynesboone.com

## <u>CERTIFICATE OF SERVICE</u>

   This is to certify that on June 10, 2022, a true and correct copy of the above and foregoing document was electronically served upon the following counsel of record as authorized by the Federal Rules of Civil Procedure:

   Michael D. Ellis
   mellis@stibbsco.com
   Adam R. Fracht
   afracht@stibbsco.com
   Stibbs & Co, PC, Attorneys
   819 Crossbridge Dr.
   Spring, Texas 77381
   Telephone: (281) 367-2222
   Facsimile: (281) 681-2330

   *Counsel for Defendants*

             /s/ *Michael J. Mazzone*
             Michael J. Mazzone